1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                  SOUTHERN DISTRICT OF CALIFORNIA

10

11   ERIC STILLER and JOSEPH MORO,       )   Case No. 3:09-cv-2473-GPC-BGS
     on behalf of themselves individually )
12   and all other similarly situated,    )   **ORDER GRANTING COSTCO'S**
                                           )   **MOTION TO DECERTIFY**
13                          Plaintiffs,    )   **CLASS AND COLLECTIVE**
     v.                                    )   **ACTIONS**
14                                         )
     COSTCO WHOLESALE                      )   **(ECF NOS. 146)**
15   CORPORATION and DOES 1 through        )
     25, inclusive,                        )
16                                         )
                            Defendants.    )
17   _____  )

18                        **<u>INTRODUCTION</u>**

19        In this collective and class action, plaintiffs Eric Stiller ("Stiller") and Joseph

20   Moro ("Moro") (both, "Plaintiffs") allege defendant Costco Wholesale Corporation

21   ("Costco") violated federal and state wage and hour laws through the implementation

22   of closing procedures that resulted in unpaid, off-the-clock ("OTC") time.  (ECF No.

23   96-1, Fourth Amend. Compl.)

24        On December 13, 2010, prior to this case's transfer to the undersigned, the

25   Honorable Marilyn L. Huff, U.S. District Judge, certified a statewide California class

26   under Federal Rule of Civil Procedure 23(b)(3) ("California Class") and conditionally

27   certified a nationwide collective action under the Fair Labor Standards Act ("FLSA

28   Class").  (ECF No. 104 ("Certification Order").)

With regard to the California Class, Judge Huff's Certification Order did not expressly "define the class and the class claims, issues, or defenses" as required by Rule 23(c)(B).   Neither did the Certification Order expressly define the FLSA Class.

The Certification Order did, however, direct the parties "to confer and submit a joint proposed notice to the Classes."  After conferring, the parties agreed to correct the liability period for the FLSA Class, and the Classes were ultimately defined as follows:

> **California Rule 23 Class:** All persons who worked for Costco Wholesale Corporation in California as hourly, non-exempt, non-union employees who were subject to Costco's closing lockdown procedures between May 15, 2005 and October 1, 2009.
>
> **FLSA Class:** All persons who worked for Costco Wholesale Corporation in the United States as full-time, hourly, non-exempt employees who were subject to Costco's closing lockdown procedures between March 1, 2008 and October 1, 2009.

(See ECF No. 217.)

Moro is the named plaintiff for the California Class, and Stiller is the named plaintiff for the FLSA Class.

On April 13, 2012, Costco filed a motion to decertify the collective and class actions ("Motion to Decertify").  (ECF No. 146.)  On July 5, 2012, Plaintiffs filed a response in opposition to Costco's Motion to Decertify, (ECF No. 172), and on July 27, 2012, Costco filed a reply, (ECF No. 177).  Thereafter, the parties filed several supplemental documents.  (See ECF Nos. 178, 190, 191, 193, 194, 195, 196, 197, 198, 199, 205, 206, 219, 220.)

On August 14, 2013, the Court granted Plaintiffs leave to submit additional evidence in support of their Opposition to Costco's Motion to Decertify.  (ECF Nos. 181, 200, 208.)  And, at the Court's direction, Plaintiffs submitted a proposed trial plan that outlines the common evidence that Plaintiffs would rely on if this case proceeded to trial.  (ECF No. 210.)  Costco filed a response to Plaintiffs' proposed trial plan. (ECF No. 211.)

The Court held a hearing on Costco's Motion to Decertify on September 27, 2013, at which counsel for Costco and Plaintiffs appeared.  (ECF No. 216.)

After a thorough consideration of the parties' submissions, the arguments of counsel, the record in this matter, and the applicable law, and for the reasons that follow, the Court will **GRANT** Costco's Motion to Decertify.

## BACKGROUND

### I.   Costco's Closing Procedures

Plaintiffs allege in their currently operative Fourth Amended Complaint that "Plaintiffs and other hourly, non-exempt employees were regularly forced, against their will, to remain locked inside of . . . [Costco] warehouses throughout California and the United States, after clocking out at the end of closing shifts."  (ECF No. 96-1 at 5.) Plaintiffs allege that, "[d]uring this unpaid lock-in time, . . . Costco's Supervisors and Managers . . . performed closing activities, such as removing jewelry from cases and emptying cash registers."  (Id.)  Thus, following certification, Plaintiffs represent classes of individuals who were subject to "Costco's closing lockdown procedures." (Id. at 6-7.)  In essence, Plaintiffs claim Costo had a uniform, companywide policy of locking its employees in warehouses during closing lockdown procedures without pay.

### A.   Plaintiffs' Evidence

It is undisputed that Costco had no express policy requiring its employees to be locked in warehouses without pay while supervisors and managers performed closing activities.   Indeed, Plaintiffs do not contend that such an express policy existed. Instead, Plaintiffs assert that it was a combination of Costco's closing, payroll, and timecard policies—as set forth in various manuals, agreements, and other sources—that resulted in a de facto companywide policy of locking employees in warehouses during closing lockdown procedures without pay.

#### 1.   Costco Manuals

Plaintiffs rely heavily on language from various versions of Costco's "Member Service and Loss Prevention Manual" and Costco's "Front End Manual" (both, "Manuals").  The Member Service and Loss Prevention Manual offered by Plaintiffs contains language from October 2004 stating:

> After the last member has been served, all perimeter alarms must be set. One door may be bypassed if a local audible alarm is installed and activated. This door, used for employees to exit the building, should be opened only on a fixed schedule (suggest 15 minute intervals). No employees should be given access to or allowed to exit the building while register tills are collected and secured in the vault.

The same manual provides that these procedures are "not meant to limit the warehouse manager's authority but are intended as minimum guidelines that must be followed to protect all company assets." The same manual further provides that, if management deems it appropriate, more stringent procedures may be implemented at the regional manager's discretion.

Turning to the October 2006 Front End Manual, it states:

> After the last member leaves the warehouse, the following tasks should be accomplished as quickly as possible. The front door closed immediately. Nobody should enter or exit the warehouse while the tills and jewelry are being collected and secured in the Vault. This process should be done as quickly as possible to minimize security risk, and to <u>minimize any delay in employees entering or exiting</u> from the warehouse. (Emphasis added.)

Plaintiffs refer to the foregoing language from Costco's Manuals as Costco's "Lockdown Policy."

**2.      Costco's Employee Agreements**

Plaintiffs also rely heavily on language from Costco's March 2004 and March 2007 Employee Agreements ("EAs"). Both the 2004 and 2007 EAs provide that employees must "swipe" in and out on Costco's automated timecard system ("ATS") exactly at the start and end of their shifts. The EAs provide that "excessive" violations of this "swipe" policy could result in escalating discipline (up to termination), and that three separate "swipe" violations in a thirty-day period is considered "excessive." Costco's Director of Human Resources and 30(b)(6) deponent, Mark Stalwick ("Stalwick"), confirmed that an employee that regularly clocked out one minute after his or her scheduled shift could be subject to disciplinary action.

Plaintiffs note that Costco's EAs further provide that employees may not work overtime without prior manager approval. On that topic, Plaintiffs provide training

materials which instruct managers to discipline employees that work unauthorized overtime.  Plaintiffs further provide the deposition transcript of class member Albert Cooper, who testified: "[W]e would have to clock out as soon as our shift ended, so to wait until we had seen a manager to clock out, they would write us up for – for not clocking out when we were done with our shift."

Plaintiffs further provide that, while Costco has an "Exception Log" to permit managers to adjust "swipe" times, recording lockdown time was not an established use for the log.  Rather, Costco's "Employee Instructions on How to Accurately Record Their Time" provides that "The ATS Exception Log is only to be used in a situation in which you cannot swipe your name badge or additional information is needed to explain your recorded swipes."  A document entitled "Automated Timecard System Policies" confirms: "The Exception Log will only be available to hourly employees if the time clock is not functioning."

Plaintiffs refer to the foregoing language from Costco's EAs and Exception Log documents as Costco's "Timecard Policy" and "Compensation Policy."

### 3.     Uncompensated Detention Time

To establish that Costco's so-called Lockdown, Timecard, and Compensation Policies operate in a way that caused employees to remain locked in warehouses without compensation, Plaintiffs rely on the deposition testimony and declarations of several Costco employees.

Plaintiffs provide deposition testimony and declarations from over 100 employees stating they were locked in warehouse without compensation while managers and supervisors completed closing procedures.  (See ECF No. 173-12.) These employees testified or declared that they experienced unpaid delays from 50% to 100% of the closing shifts they worked, and that they were delayed for periods of 5 to 60 minutes.

### 4.     Uniform, Companywide Enforcement

As evidence that Costco sought uniform, companywide compliance with

language from its Manuals, Plaintiffs provide Stalwick's deposition testimony that the Member Service and Loss Prevention Manual applies to all warehouses. Plaintiffs also provide the 30(b)(6) deposition testimony of Yusuf Ahmed, who testified that the Member Service and Loss Prevention Manual lays out opening and closing procedures for all of the warehouses in the United States.

As to the uniform, companywide use of Costco's EAs, Plaintiffs provide the deposition testimony of a Costco executive vice president, Mark Schutt, who stated that the EAs are used companywide. Plaintiffs also note that the March 2004 EA states (with regard to the standard of ethics for managers/supervisors) that managers "must adhere to Company policies and directives in all aspects of operation."

Plaintiffs assert the "mandatory nature of these policies" is further evidenced "by the fact that Costco's Warehouse Operations Department[] not only develops, but actively audits compliance with the Manuals' procedures in <u>every warehouse in the country</u> twice a year." Audit documents show that some 385 specific policies, including "closing procedures" and the administration of the ATS and payroll, are audited to identify "Audit Issues." Audit Memoranda discuss the Audit Issues, referring managers to specific sections of the Manuals as correct procedures.

The audit reports are sent to Costco's Warehouse Operations Department, in addition to executive, regional, and district VPs. The reports are reviewed by regional vice presidents to assess compliance with the audit points. Plaintiffs assert that Director of Warehouse Operations, Eric Harris, regularly pointed managers to the Manuals to identify controlling policies and procedures.

As noted above, Plaintiff also filed two requests for leave to file supplemental evidence, both of which the Court granted. The first request pertained to additional audit documents, including Costco's Auditing Manual, audit checklists, and more audit memoranda. The audit checklists and memoranda reiterate and cite the aforementioned language from the Manuals. Plaintiffs also claim that these newly submitted Audit Checklists and memoranda record instances of employees being delayed by Costco's

closing procedures.  For example, one Audit Checklist states:

> On 6/1, closing procedures were not completed as quickly as possible to minimize the security risk and delay in employees exiting the warehouse. After the last member left the building at 8:55 p.m., the jewelry procedure was not completed until 9:37 p.m., and the till procedure was not completed until 9:58 p.m.  Several employees had to wait up to 20 minutes for the procedures to be completed before they were let out of the building.[1]

(ECF No. 181-7 at 5-6.)

Plaintiffs' second request for leave to file supplement evidence pertained to internal email communications, memoranda, warehouse audit documents, and materials stored on Costco's intranet.  Several emails from upper-level management to warehouse managers relate to compliance with Costco's policies and procedures.  For example, a May 30, 2008 email sent from executive VP Dennis Zook to all warehouse managers after a robbery had occurred states:

> It is imperative that we reiterate the necessity for strictly adhering to the opening and closing procedures set forth in the operations policy and procedures manual in the loss prevention section . . . .  Again it is imperative that we adhere strictly to the Opening/Closing guidelines to protect both our people and other company assets.  The link to the Loss Prevention Portion of the operations manual [on Costco's intranet] is below.  Opening and Closing Procedures are section 6 and should be reviewed at length with your staff.

(ECF No. 200-3 at 11-12.)  Plaintiffs also provide documents showing that executive VPs were copied on Audit Memoranda summarizing individual warehouse compliance issues.

Plaintiffs also quote language from a Costco intranet page entitled, "Operations Audit," which states that, "Critical Control Concerns are areas where locations are deficient in related procedural controls, which combined, can create an environment for fraud."  (ECF No. 200-4 at 14.)  The intranet page also states, "A need has been established to focus on select locations in order to help them establish better controls.

---

[1] The Court notes that, while this evidence demonstrates Costco was aware that its closing procedures may have caused unpaid delays, it also demonstrates Costco took steps to avoid unpaid delays.  This additional fact weighs against a finding that Costco had a de facto policy of detaining employees during lockdown closing procedures without pay.

These locations will receive operations audits on a 90-day schedule until specific and measurable improvement has been achieved."

Plaintiffs also point to the fact that warehouse managers were expected to conduct self-audits on a quarterly basis to confirm compliance with Costco's policies and procedures.   An April 6, 2009 Warehouse Self Audit Checklist provides, "Warehouses should conduct quarterly self-audits.  Audits should be performed more frequently, if directed by Regional Managers.  CHECKLISTS FOR COMPLETED SELF-AUDITS SHOULD BE SUBMITTED TO YOUR WAREHOUSE REGIONAL MANAGER ON A QUARTERLY BASIS." (ECF No. 200-4 at 16.)  Audit points in the checklist include compliance with what Plaintiff's coin as Costco's Lockdown, Timecard, and Compensation Policies.

Plaintiffs also provide documents indicating that warehouse managers were required to send responses to audits to Costco headquarters and regional managers.  For example, Plaintiffs provide an email from the Warehouse Operations Department to a warehouse manager stating: "AUDIT RESPONSE DUE: FEBRUARY 12, 2008. Please 'Forward' Response to 'Warehouse Operations' Outlook Mail and to ALL the CC mail recipients," which  included Warehouse Operations staff, executive VPs, regional VPs, and district VPs. (ECF Nos. 200-4 at 47, 200-5 at 2.)  In their responses, managers explained the reasons for any lack of compliance with Costco's policies and procedures and the steps taken to remedy any deficiencies.

Plaintiffs also assert that Costco was aware that its lockdown, timecard, and compensation policies and procedures created unpaid delays.  Plaintiffs provide a letter from class member Joshua Blum to Costco personnel specialist Jamie Cox stating:

> On Tuesday the 7th of April 2009 . . . I was scheduled to work from 12:30 p.m. to 9:00 p.m. . . . . [After I clocked out], I walked to the exit door to find that it had been locked . . . .  I went back to the front end to clock back in and help clean while I was waiting to be let out.  My manager, Billy Ware, told me that I could not clock back in and work because he did not want to pay for the overtime . . . .
>
> I asked, "Why, if I was scheduled until 9:00p.m., didn't you wait to let me out and then lock the door?"  He said he needed to pull the "tills."  I said, "I understand, but if I'm scheduled to get off at a certain time, then I

1   expect to get off at that time.  If I cannot, then I should be able to remain
2   working."  Again, he said, "no".  Also, I was not the only employee
    scheduled to be off at this time–this is a common occurrence . . . .

3   When I was finally let out it was past 9:15pm.

4   (ECF No. 200-6 at 2.)

5       Cox asked for Stalwick's input with regard to Blum's letter, and Stalwick
6   responded: "If it's true [Blum] is right we need to call the GM and sure he/she is aware
7   that employees need to be paid for any time under the control of the employer,
8   including time pulling tills and jewelry if they can't leave.  [¶]  What state is this in?"[2]

9       Plaintiffs also provide documents pertaining to Costco's decision to change the
10  language in its Manuals to ensure employees were compensated for any OTC detention
11  time.  Plaintiffs provide an email from a warehouse manager to his regional manager
12  in which the warehouse manager suggests, as a remedy to the "employees off the clock
13  during jewelry and till pull lawsuit," a requirement that all buildings "pull jewelry and
14  tills at roughly the same time," and the installation of "a lockout on the time clock
15  scanning system (ATS) during this time."  (ECF No. 200-6 at 7.)

16      Plaintiff provides that, in late 2009, Costco amended its Front End Manual to
17  provide:

18      During the jewelry and till pull, station a manager at the exit door to allow
        clocked-out employees to exit as soon as the outside observer gives an
19      "all clear."  Where safety or security concerns require delays in employees
        exiting, have them do "go backs" or otherwise use the time clock or use
20      the exception log to claim compensation for delays.

21      Plaintiffs assert that, consistent with Costco's "top-down policy-making, the
22  2009 change in Costco's Lockdown, Timecard and Compensation policies was
23  executed first through memoranda from the [executive VPs] to all warehouse
24  managers[] and then revisions to the Manuals."  Plaintiffs provide a memo from
25  executive VP Joe Portera to lower-level management, stating in part: "During the
26  closing procedures of our buildings, we may be detaining employees from exiting the

27

28          [2]  The Court again notes that, while this evidence demonstrates Costco was aware that its
        closing procedures may have caused unpaid delays, it also demonstrates Costco took steps to avoid
        unpaid delays.

warehouse," and thus managers should let employees exit with "[n]o delays!"  This memo was received, reviewed, and signed by warehouse managers under Portera. (ECF No. 200-6 at 9-62.)

## B.    Costco's Rebuttal Evidence

Costco's evidence is comprised almost entirely of deposition testimony and declarations from various Costco employees.  (See ECF Nos. 146-2 through 155-1.)

Costco asserts Plaintiffs have not offered substantial evidence showing that Costco had a uniformly enforced policy of locking class members in warehouses during closing procedures without pay.  Costco contends that, to the contrary, its only uniformly enforced, companywide policy was, and is, to compensate employees for all time worked.  In support of its contention, Costco provides Stalwick's Declaration, which states:

> Costco requires that nonexempt employees accurately record the hours they work on the Automated Timecard System ("ATS").  To correct errors in ATS-recorded time, employees may use the daily ATS Time Card Exception Log and state the reason for the exception.  Employees are paid for all hours worked, including hours recorded on the ATS clock system and hours recorded through Costco's exception log.  Costco does not permit nonexempt employees to work off the clock and requires those employees to accurately record all time worked.  If employees believe that they have not been paid for all hours worked or if they feel there are inaccuracies regarding their recorded time, they may speak to their managers or the payroll department to have any errors corrected.  Costco does not encourage managers to discipline or performance-coach employees for adjusting their time records by using an exception log, except to the extent that the use of the exception log shows that an employee has repeatedly failed to use the swipe card or has repeatedly forgotten to clock in or out.[3]

In support of his Declaration, Stalwick cites Section 11.9 of the 2004 EA and Section 11.10 of the 2007 and 2010 EAs.  These sections are nearly identical and provide in relevant part:

> Timecards refer to both manual timecards and the Automated Timecard System. The Automated Timecard System accurately records your time as you swipe your employee badge through the reader. You are responsible for accurately recording your time.  Failure to accurately record your time

---

[3] Stalwick similarly testified in his deposition that Costco's policy was, and is, to compensate its employees for all hours worked.

is a violation of Company Policy.

Please record the exact time of the following:

1. When you begin your shift.

2. When you leave for your meal period.

3. When you return from your meal period.

4. When you end your shift.

It is your responsibility to be at your position when your shift begins. All time spent preparing for work (hanging up your coat, etc.) should be completed before you sign in. Other important points are as follows:

1. Never fill in a timecard ahead of time.

2. Always sign your timecard at the end of your last shift.

3. Never fill in another person's timecard.

4. All overtime requires Supervisor approval PRIOR to working overtime.

[The 2007 and 2010 EAs vary with regard to these "Other important points." The 2010 Agreement provides:]

1. Never fill in a timecard ahead of time.

2. Always sign your timecard at the end of your last shift.

3. Never fill in another person's timecard.

4. All overtime requires Supervisor approval PRIOR to working overtime. If you work overtime without prior approval, you must still accurately record all of your time worked.

5. Review, approve, and sign your time card each pay period. Excessive failure to sign the time records may result in disciplinary action.

6. Pick up your check or direct-deposit form each pay period.

Costco then provides the deposition testimony of employees who indicated they were able to resolve any payroll issues (e.g., incorrect or short hours) by talking to their managers or other payroll personnel. This includes plaintiff Stiller who testified in his deposition that, other than not being paid for time waiting at the door, he never had a problem with getting paid for the hours he worked or correcting payroll errors.

Turning to its closing procedures, Costco provides deposition testimony and declarations indicating that its warehouses posted closing times of 8:30 p.m. on

weekdays and 6:00 p.m. on weekends, but that managers did not uniformly close the customer doors at these times because of variations in: when the number of remaining customers in the warehouse could be counted, the availability of personnel to accomplish the closing process, and the possibility of customers entering just before the posted closing time. Thus, according to the deposition testimony and declarations of Costco personnel, the customer doors were typically closed between 5 and 15 minutes after the posted closing time.

Costco provides deposition testimony and declarations indicating that, after the customer doors were closed, managers would wait up to 40 minutes to begin a "soft push" or "sweep" to encourage any remaining customers to migrate to the front of the warehouse for checkout. According to deposition testimony and declarations, this could take from 5 to 15 minutes, depending on: the types of items purchased, the time the last customer of the day entered the warehouse, whether customers lingered in the food court, the day of the week, and the time of the year. Thus, according to deposition testimony and declarations of Costco personnel, the time that the last customer actually left the warehouse varied from 5 to 45 minutes after the posted closing time.

Once the last customer left, Costco asserts its managers would then "decide" whether to close all doors and set the perimeter alarm or act otherwise by, for example, letting clocked-out employees exit before locking down the warehouse. Costco asserts, for example, that if the last customer exited the warehouse at 8:55 p.m., and a group of employees was scheduled to clock out at 9:00 p.m., the manager could let the clocked-out employees exit before locking down the warehouse.[4] Costco provides several deposition transcripts and declarations that state clocked-out employees could exit without delay as long as a customer was still in the warehouse, which makes sense because the customer doors remained open until the last customer exited.

---

[4] In support of this assertion, Costco cites: "Hyatt Dec. ¶ 9, Vasquez Dec. ¶ 7." Neither of these sources, however, supports Costco's assertion. The Hyatt Declaration is not listed in Costco's Appendix of Evidence. (See ECF No. 146-2.) And the Vasquez Declaration does not say at ¶ 7 that managers could wait for clocked-out employees to exit after the last customer departed before locking down the warehouse. (See ECF No. 146-13 at 99-100.)

Costco asserts that, after the customer doors were closed, managers and supervisors would begin pulling register tills and jewelry. Costco asserts the amount of time it would take to do this would vary. Costco provides deposition testimony and declarations of its personnel indicating that some managers would begin the till and jewelry pulls immediately, while other managers waited for clocked-out employees to leave. For example, Costco cites the Chelini Declaration, which states:

> sometimes we kept the member exit door open for a few minutes after the last member exited if we saw employees who had clocked out walking towards the door . . . . [or] if we saw Costco employees wearing orange vests on "cart duty" approaching the member exit door so they could exit the warehouse and begin collecting the carts from the parking lot.

Costco also provides the deposition transcript of Robin Gau, who testified "there was not one day where her shift ended and she could clock out and leave" if the tills were being pulled. Gau testified, "Pretty much everybody got stuck there. It's like as soon as they rolled the [customer] door down, you had a 15-minute grace period before they would pull the tills." "So in that 15-minute window, a manager would go over to the man door or the exit door and wait and people could get out then."

Costco provides deposition testimony and declarations showing the length of the till and jewelry pull process could take from 3 to 30 minutes depending on the methods used (e.g., pulling tills and jewelry simultaneously or consecutively, using more/fewer employees to complete process).

Taking on the Loss Prevention Manual language stating that managers "should not" allow employees to exit during till pulls, Costco provides deposition testimony and declarations of its personnel demonstrating variations in the amount of time, if any, that Costco's closing procedures caused clocked-out employees to suffer delays in exiting.

Costco provides deposition testimony and declarations indicating that some managers: would sometimes warn employees that the warehouse was going to be locked down in an effort to allow clocked-out employees to exit; would sometimes allow employees to stay on the clock and/or to clock back in during the pulls; believed

they had the ability to permit, and indeed sometimes permitted, employees to record their lockdown time on an exception log[5]; and attempted to avoid unpaid detention time by scheduling employees to work shifts outside the window in which jewelry and till pulls were likely to occur.

Costco also offers deposition testimony and declarations indicating that—contrary to the Manuals' instruction that no one should be allowed to enter or exit during pulls—some managers sometimes allowed employees to exit during the till and jewelry pulls. Deposition transcripts and declarations similarly show that some managers would station someone near the employee exit door to let clocked-out employees leave or would require employees to check with managers before clocking out.

Costco further provides deposition testimony and declarations showing that employees themselves made choices that affected whether they would experience pull-related delays. Costco cites the Gardner Declaration, for example, in which Gardner states:

> My managers have told me that I'm not supposed to clock out unless a manager is already there and ready to let me out. On occasion, I might clock out before a manager is there to let me out if I want to socialize a bit before leaving. Because it's my choice to stay a little longer to socialize, I don't feel right about being on the clock for this time, so I'll talk for a minute or so while waiting for a manager to walk up to let me out.

(ECF No. 154-1 at 70.)

Costco also provides deposition testimony and declarations indicating that pharmacy departments in warehouses closed before the posted closing times, and thus pharmacy employees did not experience any unpaid detention time.

Finally, Costco offers deposition testimony and declarations demonstrating that some employees experienced exiting delays after the pulls were completed. Costco cites the deposition transcript of Chris Anglin, who testified that he was delayed in

---

[5] Only one manager, however, stated that employees actually used the exception log to record detention time resulting from Costco's closing procedures. (ECF Nos. 148-1 at 52, 146-12 at 14-15.) Thus, even if the Exception Log were theoretically available to employees to record detention time resulting from Costco's closing procedures, Costco has offered practically no evidence demonstrating that the Exception Log was in fact used for this purpose.

exiting by an average of ten to fifteen minutes due to post-pull activities, such as managers counting money in the vault or "be[ing] in back, doing receiving procedures." (ECF No. 146-4 at 25, 31.) Costco also cites, for example, the deposition testimony of Shevon Cunningham, claiming she "only waited to exit during shifts ending at 10 p.m., half the time she waited five minutes, but it could take up to 20 minutes." (ECF No. 152-1 at 44.) Cunningham, however, did not testify that she "only waited to exit during shifts ending at 10 p.m." She testified that, from the time the tills and jewelry were put away, she waited anywhere from 10 to 30 (typically 20) minutes to be released. (ECF No. 146-4 at 223-24.) Regarding her shifts that ended at 10:00 p.m., Cunningham testified that she experienced exiting delays after approximately 50% of her shifts for an average of 5 minutes. (Id. at 226-27.)

## DISCUSSION

The Court will first address Costco's Motion to Decertify as it pertains to the California Class, after which the Court will consider Costco's Motion as to the FLSA Class.

## I.   Rule 23 Class

### A.   Legal Standard

"An order that grants or denies class certification may be altered or amended before final judgment." Fed. R. Civ. P. 23(c)(1)(C); Rodriguez v. West Publ'g Corp., 563 F.3d 948, 966 (9th Cir. 2009) ("A district court may decertify a class at any time."). In deciding whether to decertify a class, a court may consider "subsequent developments in the litigation." Gen. Tel. Co. of S.W. v. Falcon, 457 U.S. 147, 160 (1982). "In considering the appropriateness of decertification, the standard of review is the same as a motion for class certification: whether the Rule 23 requirements are met." Marlo v. United Parcel Serv., Inc., 251 F.R.D. 476, 479 (N.D. Cal. 2008).

"A party seeking class certification must affirmatively demonstrate his compliance with [Rule 23(a)]—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Wal-Mart

<u>Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2551 (2011)   A court must thus conduct a "rigorous analysis" in determining whether the prerequisites of Rule 23(a) have been satisfied.  <u>Id.</u>  This "rigorous analysis" frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim." <u>Id.</u>

"Just as the party moving for class certification bears the burden of demonstrating that the proposed class satisfies the elements of Rule 23, the party moving for class decertification . . . bears the burden of demonstrating that an element of Rule 23 is not satisfied." <u>Iorio v. Allianz Life Ins. Co. of N. Am.</u>, 2008 WL 8929013, at *23 (S.D. Cal. July 8, 2008) (citing <u>Gonzalez v. Arrow Fin. Servs. LLC</u>, 389 F. Supp. 2d 1140 (S.D. Cal. 2007)).  To prevail on a motion to decertify, the defendant "faces a heavy burden because doubts regarding the propriety of class certification should be resolved in favor certification." <u>Gonzalez</u>, 389 F. Supp. 2d at 1154 (internal quotation marks omitted) (citing <u>Slaven v. BP America, Inc.</u>, 190 F.R.D. 649, 651 (C.D. Cal. 2000)).

**B.     Analysis**

Costco argues Rule 23(a)'s commonality requirement and Rule 23(b)'s predominance and superiority requirements are no longer satisfied.  The Court will address these requirements in turn.

**1.     Commonality**

**i.     Legal Standard**

A class may remain certified only if "there are questions of law and fact common to the class."  Fed. R. Civ. Proc. 23(a)(2).  Commonality requires the plaintiff to demonstrate that the "class members have suffered the same injury." <u>Dukes</u>, 131 S. Ct. at 2551 (quotation marks omitted).  Whatever the common theory of liability is, it "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." <u>Id.</u>

The commonality inquiry does not require plaintiffs to demonstrate the

"predominance" of common issues over individualized ones, nor the "cohesion" of the class. <u>Negrete v. Allianz Life Ins. Co. of N. Am.</u>, 287 F.R.D. 590, 601-02 (C.D. Cal. 2012) (citing <u>Dukes</u>, 131 S. Ct. at 2556 (disclaiming any intent to overlap "Rule 23(a)(2)'s commonality requirement with Rule 23(b)(3)'s inquiry into whether common questions 'predominate' over individual ones")).   When considering commonality, dissimilarities should not be considered "to determine whether common questions predominate," as Rule 23(b)(3) requires; "even a single common question will do." <u>Dukes</u>, 131 S. Ct. at 2556.

### ii.    Analysis

In finding the commonality requirement satisfied, Judge Huff found that Moro had sufficiently demonstrated "that Costco's 2004 Loss Prevention Procedures Manual, which provided the guidelines for closing procedures, including lockdowns, applied to all of its United States Warehouses."  (ECF No. 104 at 8.)  Judge Huff found, "Common factual issues include whether these policies forced class members to spend unpaid time in lockdowns."  (<u>Id.</u>)  In sum, Judge Huff concluded "the claims of the Plaintiff and the prospective class share central questions of fact and law regarding Costco's official centralized policy which caused employees to be detained without pay during lockdowns."  (<u>Id.</u> at 8-9.)

Costco argues the commonality requirement is no longer satisfied because, under the more exacting standard announced in <u>Dukes</u>, liability for unpaid detention time cannot be established in one stroke under the circumstances of this case.  Costco asserts the question of whether its closing practices caused class members to "remain at work without pay after clocking out for the day" cannot be answered the same way for each class member.  Costco argues that, instead, "[t]he success of Plaintiffs' theory of liability depends on which class member testifies."

Costco argues "[t]he alleged till-pull policy Moro relies upon does not establish commonality, because that alleged policy, even if established, would not establish liability for the class in one stroke."  Costco contends that:

> [e]ven if every warehouse followed a supposed policy that employees not exit during a register till pull, there would not necessarily be liability to each class member, because liability in every case would turn on answers to numerous additional questions implicating the differing scheduling and release practices that different managers followed at different warehouses.

Costco provides that, "Many class members could exit the warehouse before the exit door closed,[] and other class members worked shifts that ended only after till pulls were completed." "Other class members, if they reached the time clock without realizing the doors were closed, could simply stay on the clock and continue working while the tills were pulled or use exception logs to be paid for delays." Costco thus asserts that:

> whether any employee actually incurred significant unpaid waiting time because of till pulls would entail individualized inquiries as to (1) whether the exiting employee experienced a delay, and even if so, whether it was more than a de minimis delay,[] (2) whether the employee waited in the warehouse as a matter of personal choice, (3) whether the employee remained clocked in, or clocked back in, during till pulls (and thus received pay), and (4) whether the employee was paid for any delay through use of an exception log—among many other reasons.

Moro argues in response that, contrary to Costco's position, discovery taken since Judge Huff certified the California Class "has confirmed—through a variety of evidence, including admissions—that Costco's policies caused unpaid lockdown time across California and the United States." Moro argues that Costco has produced no new and determinative evidence that demonstrates a lack of commonality. Citing Schulz v. Qualxserv, LLC, 2012 WL 1439066, at *4 (S.D. Cal. Apr. 26, 2012), Moro argues that "[a]ssessing the existence, impact, and legality of Costco's nationwide policies will result in precisely the sort of 'common answer' that was lacking in Wal-Mart."

In this regard, Moro asserts he and Stiller are not, as Costco asserts, challenging unpaid delays arising only from the till and jewelry pulls, but are instead challenging unpaid delays experienced even after the till and jewelry pulls were completed due to Costco's requirement that warehouses be locked down once the last customer left, with employees only being allowed to exit through a designated door on a fixed schedule.

Moro asserts the existence and unlawful effect of Costco's policies can be proved on a classwide basis using, among other things, Costco's Manuals, EAs, audit memoranda and checklists, internal communications, class member testimony, and other documentation demonstrating that these policies was implemented and enforced on a companywide basis. Moro argues the combined effect of these policies "bridges the gap between an individual grievance and class-wide injury."

Here, Moro's theory of commonality rests on the assertion that Costco had a uniformly enforced, companywide policy of locking employees, who had already clocked-out, in warehouses for a compensable amount of time without pay while closing procedures were completed. Plaintiffs have, of course, offered no evidence that Costco had an express policy of this nature. Rather, Plaintiffs contend Costco had an implied or de facto policy of this nature. The Court refers to this de facto policy as the "Alleged Policy."

California law requires that employees be compensated for all time "during which an employee is subject to the control of an employer," which includes "all the time the employee is suffered or permitted to work, whether or not required to do so." Morillion v. Royal Packing Co., 22 Cal. 4th 575, 585-87 (2000). Thus, in addition to the common questions of whether the Alleged Policy existed and operated on a companywide basis, an additional common question is whether the Alleged Policy resulted in employees being subject to Costco's control. See Otsuka, 2010 WL 366653, at *6 ("[A]pplication of the 'control' rule presents a common question of law that can be resolved on a class basis, outweighing any individualized inquiries that will be required."); Cervantez v. Celestica Corp., 253 F.R.D. 562, 572 (C.D. Cal. 2008) ("Plaintiffs have established at least one common question of law common to all members of the security line class: whether time spent in the security line at the end of a shift is compensable under the California Labor Code."); Brinker Rest. Corp. v. Super. Ct., 53 Cal. 4th 1004, 1051 (2012) ("Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws

are of the sort routinely, and properly, found suitable for class treatement."); Schulz v. QualxServ, LLC, 2012 WL 1439066, at *4 (S.D. Cal. 2012) ("[W]hether the Defendants' policies and practices comply with California's specific requirements is the type of question that can be answered on a classwide basis.") (citing Dukes, 131 S. Ct. at 2551; Dilts v. Penske Logistics, LLC, 267 F.R.D. 625, 632-33 (S.D. Cal. 2010) (finding "common factual questions, such as whether Defendants' policies deprived the putative class members of meal periods, rest periods, overtime pay, and reimbursement for installation tool expenses, and common legal questions, such as Defendants' obligations under California [law].")).[6]

The Court concludes Costco has failed to satisfy its "heavy burden" of demonstrating that Rule 23(a)'s commonality requirement is no longer satisfied. In addition to the evidence Judge Huff relied on in finding the commonality requirement satisfied, Plaintiffs have offered substantial, albeit partially rebutted, evidence demonstrating that Costco had a de facto policy of detaining employees in warehouses during closing procedures without pay.

That said, the Court finds that determining whether the Alleged Policy existed, was enforced on a companywide basis, and operated in a way that resulted in employees being under Costco's control, will only answer the question of whether employees were sometimes detained without pay as a result of the Alleged Policy.

Costco has offered convincing evidence that not all employees experienced unpaid delays as a result of the Alleged Policy. And, if it can only be determined on a classwide basis whether the Alleged Policy sometimes resulted in unpaid OTC time, individualized determinations will be required to determine the question of liability. This is because liability hinges on whether employees actually performed OTC work. See York v. Starbucks Corp., 2011 WL 8199987, at *17 (C.D. Cal. Nov. 23, 2011)

---

[6] The Court's finding that Plaintiffs have offered substantial proof of the existence of the Alleged Policy distinguishes this case from those relied on by Costco: Corwin v. Lawyers Title Insurance Co., 276 F.R.D. 484 (E.D. Mich. 2011), Scott v. First American Title Insurance Company, 276 F.R.D. 471 (E.D. Ky. 2011), and Gonzalez v. Millard Mall Services, Inc., 281 F.R.D. 455 (S.D. Cal. 2012).

("[A] plaintiff may establish liability for an off-the-clock claim by proving that (1) he performed work for which he did not receive compensation; (2) that defendants knew or should have known that plaintiff did so; but that (3) the defendants stood 'idly by.'") (quoting Adoma v. Univ. of Phoenix, Inc., 270 F.R.D. 543, 548 (E.D. Cal. 2010)); Ortiz v. CVS Caremark Corp., 2013 WL 6236743, at *9 (N.D. Cal. Dec. 2, 2013) ("To prove an off-the-clock claim, a plaintiff must demonstrate that she actually worked off the clock, that she was not compensated for it, and the employer was aware or should have been aware that she was performing off the clock work.").

Of course, the existence of individualized questions does not per se defeat commonality. Rather, the commonality requirement is met so long as there is a single common question that goes to the core of Plaintiffs' claims and that can be answered on a classwide basis. The Court finds the questions of whether the Alleged Policy existed, was enforced on a companywide basis, and resulted in Costco's control over employees satisfy the commonality requirement. Accordingly, the Court will not decertify the California Class for lack of commonality.

### 2.    Predominance

#### i.    Legal Standard

The predominance inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." Vinole, 571 F.3d at 945 (quoting Hanlon, 150 F.3d at 1022). The predominance inquiry also includes consideration of whether "adjudication of common issues will help achieve judicial economy." Vinole, 517 F.3d at 945 (quoting Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1189 (9th Cir. 2001)).

Recently, the Supreme Court explained that the same "rigorous analysis" required of Rule 23(a)'s commonality requirement also applies to Rule 23(b)(3)'s predominance requirement. Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than

Rule 23(a).")  Thus, courts should "take a close look at whether common questions predominate over individual ones."  Id. (internal quotation marks omitted).

In <u>Lou v. Ma Laboratories, Inc.</u>, the Northern District of California found Rule 23(b)(3)'s predominance requirement unmet in an OTC overtime case where the plaintiff employees "ha[d] <u>not</u> identified a common method of proof on a classwide basis for their off-the-clock claims" where "employee time-keeping and overtime practices varied greatly." 2014 WL 68605, at *3 (N.D. Cal. Jan. 8, 2014).  Reviewing more than 64 declarations submitted by the parties, the court noted there were variations in when employees would work overtime, request overtime, and claim overtime.  Id.  The court found "[t]hese collective variations cause plaintiffs' off-the-clock claims to necessarily dissolve into a series of mini-trials." Id. at *4.

The <u>Lou</u> court rejected the opinion offered by plaintiffs' proposed expert, Dr. Richard Drogin (the same expert retained by plaintiffs in this case), that individualized damages could be calculated using time-clock data and OTC time estimates based on the phone calls employees made and the emails employees sent while at work.  Id.  In rejecting Dr. Drogin's opinion, the court noted there were "individualized variances" with regard to time-clock data.  Id.  The court further noted the phone calls and emails were "not evidence that the employee was doing compensable work," given that they could have been making personal calls and sending personal emails.  Id.  The court further noted Dr. Drogin only reviewed email data for 15 employees and phone data for 42 employees—"a small subset of the proposed class."  Id.  The Court concluded that, "[w]ithout a method of classwide damages proof tethered to plaintiffs' theory of liability, it becomes difficult to imagine how plaintiff's class action could proceed." Id.

### ii.    Analysis

Costco argues individualized questions predominate over common questions because, as the Court concluded above, the Alleged Policy does not trigger automatic liability.  Costco asserts individualized determinations are required to determine

whether each class member:

> (1) clocked out while intending to immediately exit, (2) was unable to exit because the manager was conducting a till pull, (3) did not radio or otherwise ask anyone to open the warehouse doors (and explain why), (4) did not clock back into the ATS system (and explain why), (5) waited for a compensable amount of time, and (6) did not log the waiting time in the exception log (and explain why).

Costco goes on to argue that its defenses also require individualized determinations. Costco emphasizes that determining whether employees were delayed for longer than a de minimis amount of time would require individualized inquiries because each employee's individual circumstances would have to be evaluated to determine the length of any OTC time. Costco asserts this is not merely a matter of damages because the de minimis rule is a defense to <u>liability</u>.[7]

In response, Moro asserts that Costco's purported individual questions regarding when an employee clocked out and was or was not allowed to clock back in are determinable on a classwide basis by resort to Costco's timecard and compensation policies. Moro argues that Costco's purported individualized questions regarding whether employees were unable to exit a warehouse and/or whether they waited a compensable amount of time are determinable on a classwide basis by resort to Costco's lockdown policy. The exact time of any delays, Moro argues, can be estimated by a just and reasonable inference, as set forth more fully below.

In support of his position, Moro cites <u>Lopez v. G.A.T. Airline Ground Support, Inc.</u>, 2010 WL 3633177 (S.D. Cal. 2010). In <u>Lopez</u>, the court found the predominance requirement satisfied despite the need for some individualized inquiries "in light of the

---

[7] It is not clear that the de-minimis rule applies under California law. <u>See Bustamante v. Teamone Emp't Specialists, LLC</u>, 2011 WL 1844628, at *10 (Cal. Ct. App. May 17, 2011) (noting plaintiff's argument that de minimis rule is inconsistent with California wage and hour law, but declining to determine whether the de minimis rule applies to California wage and hour cases.)

The California cases that apply the rule do not address the preliminary question of whether it should be applied under California law. <u>See Gomez v. Lincare, Inc.</u>, 173 Cal. App. 4th 508, 526 (2009) (applying de minimis rule without question); <u>LoJack Corp., Inc. v. Super. Ct.</u>, 2010 WL 1137044, at *8 (Cal. Ct. App. Mar. 26, 2010) (citing <u>Gomez</u> as authority that de minimis rule applies).

size of the class."[8]   The court further reasoned: "Where, as here, the claim asserted by a proposed class is based upon a consistent employer practice, class certification is usually appropriate." Id. at *8 (citing Kamar v. Radio Shack Corp., 254 F.R.D. 387, 398 (C.D. Cal. 2008)).   Among other claims, the plaintiffs in Lopez argued their employer's policy of requiring employees to ride a shuttle bus to work resulted in unpaid OTC time.   The employer asserted that individualized inquires regarding whether employees could have used other transportation or were even required to use the shuttle defeated predominance.   The court rejected this argument, finding these individualized inquiries "go directly to the common legal question of whether [the employer] should have compensated employees for their travel time." Id. at *10.[9]

Moro also relies on Jimenez v. Allstate Insurance Co., 2012 WL 1366052 (C.D. Cal. Apr. 18, 2012).   In Jimenez, the plaintiff brought a putative class action on behalf of himself and about 1,300 other insurance claims adjusters, claiming Allstate failed to pay required overtime compensation and provide required meal and rest breaks.   The plaintiff sought to certify a class that was defined to include all claims adjusters with similar titles and/or job duties that worked for Allstate during the class period.

When it came to predominance, the court agreed that "a number of individualized questions [existed], including whether individual employees worked off-the-clock." Id. at *19.   The court nonetheless found the predominance requirement satisfied, noting that "courts have certified classes and allowed collective actions to proceed notwithstanding such circumstances." Id. The court observed: "Generally, the more narrowly defined the class, and the more evidence of a controlling company-wide policy, the more likely it is that the class will be permitted to proceed."

---

[8] The class size was comprised of less than 1,400 individuals.

[9] This Court finds the Lopez analysis unpersuasive because the employer's proffered individualized inquiries did not go to the common legal question of whether the employer should have compensated employees for their travel time; rather, they went to demonstrating that the employer did not in fact have a policy that required all employees to ride the shuttle to work. Post Dukes, the Lopez court likely would have determined whether the employer did in fact have a companywide policy that would allow a fact finder to resolve the issue of OTC liability on a classwide basis.

The <u>Jimenez</u> court found that, while Allstate had a policy of paying all overtime compensation owed, the plaintiff had "presented sufficient evidence to support the inference that Allstate ha[d] a common practice of not following its overtime policy." <u>Id.</u> at *8.  The court thus found the predominance requirement met despite the need for individualized determinations, emphasizing the relatively small class size and the fact that any managerial discretion in causing unpaid OTC time was limited to "the details of enacting a company-wide policy or directive." <u>Id.</u> at *19.

Moro further asserts that, in the Ninth Circuit, "individual damages questions do not defeat the propriety of class certification." Moro relies on <u>Stearns v. Ticketmaster Corp.</u>, in which the Ninth Circuit reiterated that "the mere fact that there might be differences in damage calculations is not sufficient to defeat class certification." 655 F.3d 1013, 1026 (9th Cir. 2011) (citing <u>Yokoyama v. Midland Nat'l Life Ins. Co.</u>, 594 F.3d 1087, 1094 (9th Cir. 2010).[10]

Regarding Costco's defenses, Moro claims they can be decided using common proof.  Moro first asserts that the de minimis defense is largely a damages issue that can be decided on a classwide basis by determining the regularity and aggregate amount of unpaid time.  Moro asserts that, even if Costco's de minimis defense requires individualized inquiries, common questions still predominate.

At the outset, the Court rejects Moro's assertion that individualized damages issues cannot defeat predominance.  The Supreme Court's decision in <u>Comcast</u> makes

_____

[10] Moro similarly relies on <u>Williams v. Superior Court of Los Angeles</u>, 221 Cal. App. 4th 1353 (2013), to support its argument that variations in OTC time do not defeat predominance.  In <u>Williams,</u> the California Court of Appeal found a class action appropriately certified where a group of auto insurance adjusters claimed they had incurred uncompensated OTC time in performing their duties (e.g., "setting voicemail messages and checking for schedule and travel changes") before and/or after completing their scheduled onsite auto inspections.  In applying California's class-certification rules, the court concluded predominance was not defeated by any variations in the amount of OTC each adjuster incurred because that was ultimately a question of damages and because "differences in the amount of individual damages do not by themselves defeat class certification." <u>Id.</u> at 1365-66.  The court recognized, however, that "under federal class action rules, differences in method of calculating damages arising from individualized damages may defeat certification of class." <u>Id.</u> (citing <u>Comcast</u>, 133 S. Ct. at 1432-33); <u>see also Jones v. Farmers Ins. Exchange</u>, 221 Cal. App. 4th 986, 996-96 (2013) (applying California class action rules to find OTC claims suitable for certification even though amount of OTC time each class member incurred varied).

clear that individualized damages determinations can defeat Rule 23(b)(3)'s predominance requirement.  133 S. Ct. at 1433, 1435.  It thus appears that Comcast abrogates Stearns and Yokoyama in this regard.

"It is clear that considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." Stearns v. Ticketmaster Corp., 655 F.3d 1013, 1020 (9th Cir.2011).  To prove an OTC claim, a plaintiff must demonstrate (1) he or she performed work, for which (2) he or she did not receive compensation, and of which (3) the employer was aware or should have been aware.  Adoma, 270 F.R.D. at 548; Ortiz v. CVS Caremark Corp., 2013 WL 6236743, at *9 (N.D. Cal. Dec. 2, 2013).

As discussed above, common questions exist with regard to whether the Alleged Policy existed, was enforced on a companywide basis, and resulted in Costco's control over employees.  These common questions, however, go to whether OTC work resulting from the Alleged Policy constituted "work" (i.e., whether class members subject to the Alleged Policy were under Costco's control and whether Costco was aware that employees experienced unpaid detention times) and whether Costco took action to remedy any unpaid detention times.  In other words, these common questions go to the second and third elements of an OTC claim.  As to the first element, however, there is no common answer as to whether each class member actually performed uncompensated OTC work.

Assuming Plaintiffs prove the existence of the Alleged Policy and that the Alleged Policy sometimes resulted in unpaid detention time, there is no classwide method, of determining whether, how often, and for how long class members actually experienced unpaid OTC time as a result of the Alleged Policy.  As such, liability cannot be proved on a classwide basis without thwarting Costco's ability to demonstrate that some class members, due to a variety of circumstances, did not actually experience unpaid OTC time despite being subject to the Alleged Policy.  See Dukes, 131 S. Ct. at 2561 (rejecting trial-by-formula approach were defendant would

be deprived of litigating individualized defenses); <u>Mendoza v. Home Depot, USA, Inc.,</u> 2010 WL 424679, at *10 (C.D. Cal. Jan. 21, 2010) (denying class certification where variations in employee experiences made it appropriate to provide defendant opportunity to raise individualized defenses).

Plaintiffs provide in their proposed trial plan that, once common questions related to liability are answered in a "Stage One" proceeding, the Court can choose from among four methods to ascertain the actual amount of unpaid detention time experienced by individual class members as a question of damages in a "Stage Two" proceeding.

To establish liability, Plaintiffs contend the following issue would need to be resolved in the "Stage One" proceeding:

> Whether, during the respective liability periods, Costco's lockdown, timecard, and compensation policies caused members of the Plaintiff classes <u>to perform work</u> for which they were improperly compensated and the amount and extent of that work "as a matter of just and reasonable inference," determined as the "reasonable time" taken for the activities performed during the lockdown periods while employees were detained.

(ECF No. 210 at 6 (emphasis added) (citing, e.g., <u>Anderson v. Mt. Clemens Pottery Co.</u>, 328 U.S. 680, 687 (1946).) To establish this predicate to liability, Plaintiffs intend to rely on "Costco's Payroll and ATS databases containing the scheduled shifts, hours worked, and wages paid to all class members"; "The study and report of time-and-motion expert Jeffrey Fernandez measuring the time required to perform the activities that had to take place while employees were being detained without pay"; and "A database Costco represents to include records of cash register logouts." The Court rejects this approach.

Using Costco's payroll and scheduling records, along with Costco's cash register data, one could infer that a number of employees who clocked out during a till pull were detained without pay because of language in Costco's Manuals requiring warehouses to be secured during such pulls. However, such an inference is rebutted by evidence of the discretion Costco managers had with regard to how often clocked-

out employees were permitted to leave once warehouses were locked down.  Even if managers were not vested with such discretion, Plaintiffs do not limit their claims to unpaid detentions caused by Costco's till-pull procedures.  Plaintiffs include unpaid detentions caused by, among other activities, Costco's jewelry-pull procedures.  And there are no records–like the cash register logouts–that would permit an inference that clocked-out employees were being detained during closing procedures.

As for the time-and-motion expert opinion, the Court disagrees that this is an acceptable form of common proof of <u>liability</u>.  Among other cases, Plaintiffs cite <u>McDonald v. Kellog Co.</u>, 2011 WL 6372870, at *3 (D. Kan. Dec. 20, 2011), for the proposition that reasonable estimates of the time required for all closing activities may be used to determine whether the Alleged Policy caused employees to "perform work" and also the "amount and extent of that work."  While such estimates might be able to measure the amount and extent of any "work," they may not be used to establish liability.  The <u>McDonald</u> court explained that such estimates were only available to use as common proof "<u>upon a liability determination</u>."  <u>Id.</u> (emphasis added).  There, all employees were affected by a uniform policy <u>in the same way</u>; thus, none of the liability issues in that case hinged on whether <u>every</u> employee experienced uncompensated time.  Here, by contrast, Plaintiffs have only established that the Alleged Policy resulted in unpaid OTC time for some employees.  Thus, liability issues in this case will indeed turn on individualized inquiries.

The Court rejects Plaintiffs' assertion that the approach used in <u>Mt. Clemens</u> can be used here to establish, "as a matter of just and reasonable inference," the average frequency and length of detention time that the Alleged Policy caused.  Again, Plaintiffs put the damages cart before the liability horse.  <u>Mt. Clemens</u> first requires that an employee "prove[] that he has in fact performed work for which he was improperly compensated."  <u>Id.</u> at 687.  Accordingly, while the <u>Mt. Clemens</u> approach may offer a classwide basis of proving damages, proving liability in this case first requires individuals to show they performed uncompensated "work" as a result of the

Alleged Policy.  See Gomez v. Tyson Foods, Inc., 2013 WL 5516189, at * (D. Neb. Oct. 1, 2013) ("The relaxed burden [described in Mt. Clemens] applies only to damages, not liability—it does not help plaintiffs show that there was a violation under the FLSA; it only allows them to prove damages by way of estimate, if they had already established liability." (citing O'Brien v. Ed Donnelly Enterprises, Inc., 575 F.3d 567, 602 (6th Cir.2009)).

Still, at least one court has certified a OTC class despite the existence of individualized questions where the class was narrowly defined, consisted of about 1,300 members, and where there was evidence of a controlling company-wide policy. See Jimenez, 2012 WL 1366052 at *19 (compiling cases).  Here, while there is evidence of a controlling company-wide policy, the California Class is, in the first place, not narrowly defined and, in the second place, is comprised of approximately 30,000 individuals.  As currently defined, the California Class includes anyone subject to the Alleged Policy.  Thus, at a minimum, the class would need to be redefined to include employees who were not only subject to the Alleged Policy, but who also experienced unpaid detention times as a result of the Alleged Policy.  Defining the California Class in this way, however, would–in essence–require a liability finding as to each employee to determine whether he or she were even a member of the California Class.  And undertaking individualized inquiries as to approximately 30,000 individuals—even in a bifurcated proceeding as Plaintiffs propose—would result in the commons questions here being overcome by individualized inquiries.  See O'Donnell v. Robert Half Int'l, Inc., 250 F.R.D. 77, 81 (D. Mass. 2008) (concluding predominance requirement unsatisfied where plaintiffs had presented no evidence to suggest that determining whether every employee was subject to improper payroll deductions on a class-wide basis).

This case is unlike Otsuka v. Polo Ralph Lauren Corp., 2010 WL 366653, where every class member experienced the same type of unpaid detention as a result of Polo's companywide policy requiring its employees' bags to be searched before leaving work.

It is also unlike Cervantez v. Celestica Corp., 253 F.R.D. 562, where every class member experienced the same type of unpaid detention as a result of a companywide policy requiring employees to pass through security before entering and leaving work.

This case is more like Koike v. Starbucks Corp., 378 Fed. App'x 659, where the Ninth Circuit affirmed a district court's denial of class certification based on a finding that "individualized factual determinations were required to determine whether class members did in fact engage in OTC work and whether Starbucks had actual or constructive knowledge of the OTC work performed." Id. at 661. This case is also more like Cornn v. United Parcel Service, Inc., 2005 WL 2072091, where the district court concluded Rule 23(b)(3) was not satisfied because individualized inquiries as to whether each class member actually performed compensable work before his or her recorded start time predominated over any common questions.

Based on the foregoing, the Court finds Costco has satisfied its burden of demonstrating that Rule 23(b)(3)'s predominance requirement is no longer satisfied. See Babineau v. Fed. Express Corp., 576 F.3d 1183, 1187 (11th Cir. 2009) (affirming district court's finding that predominance requirement unmet in OTC case where individualized inquiries were required to determine whether and why employees arrived early or stayed late); Basco v. Wal-Mart Stores, Inc., 216 F. Supp. 2d 592, 601-03 (E.D. La. 2002) (finding predominance requirement unmet in OTC case where individualized issues would "arise from the myriad of possibilities that could be offered to explain why any one of the plaintiffs worked off-the-clock."); Purnell v. Sunrise Senior Living Mgmt., Inc., 2012 WL 1951487 (C.D. Cal. Feb. 27, 2012) (finding predominance requirement unmet where (1) plaintiff offered no evidence of a companywide policy of requiring employees to miss meal and rest breaks, and (2) individualized inquiries required as to whether and why employees missed breaks); Espenschield v. DirectSat USA, LLC, 2011 WL 2009967, at *5 (W.D. Wis. May 23, 2011) (decertifying class despite existence of uniform policies and practices because evidence suggested success of plaintiffs' claims depended on how individual class

members responded to the numerous policies and practices at issue).

Because the Court finds Rule 23(b)(3)'s predominance requirement is no longer satisfied, the Court does not address Costco's argument that Rule 23(b)(3)'s superiority requirement is no longer satisfied.  The Court thus goes on to determine whether the FLSA Class should also be decertified.

## II.   FLSA Collective Action

### A.   Legal Standard

The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1). Section 16(b) of the FLSA provides that an employee may bring a collective action on behalf of himself and other "similarly situated" employees.  29 U.S.C. § 216(b).  In a § 216(b) collective action, employees wishing to join the suit must "opt-in" in order to be bound by the outcome of the collective action.  Id.; Leuthold v. Destination Am., Inc., 224 F.R.D. 462, 466 (N.D. Cal. 2004).

The FLSA does not define the term "similarly situated," and there is no Ninth Circuit precedent specifically interpreting the term.  Adams v. Inter-Con Sec. Sys., Inc., 242 F.R.D. 530, 536 (N.D. Cal. 2007).  Rather, district courts employ a two-tiered approach to decide whether collective treatment is appropriate.  At the first-tier stage, the court determines, "based primarily on the pleadings and any affidavits submitted by the parties, whether the potential class should be given notice of the action."  Smith v. T-Mobile USA, Inc., 2007 WL 2385131, at *3 (C.D. Cal. Aug. 15, 2007).  After discovery is complete, the "more rigorous" second-tier analysis is designed to determine whether the plaintiffs are "similarly situated" to justify proceeding as a collective action.  Leuthold, 224 F.R.D. at 467; T-Mobile, 2007 WL 2385131, at *7. "The second-stage analysis, however, is still 'considerably less stringent than the requirement of Rule 23(b)(3) that common questions predominate.'"  Troy v. Kehe

31

Food Distribs., Inc., 276 F.R.D. 642, 649 (W.D. Wash. 2011) (quoting Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996)).[11] Whether certification of a § 216(b) collective action is appropriate is within a district court's discretion.  Leuthold, 224 F.R.D. at 466.

In her Certification Order, Judge Huff conditionally certified an FLSA collective action and determined "Plaintiffs ha[d] presented sufficient allegations of Costco's official centralized policy affecting its hourly employees."  (See ECF No. 104 at 6.) Judge Huff further determined that, because discovery was ongoing, the second-stage analysis should be reserved for a later date.  (Id.)  Judge Huff therefore directed that notice be sent to Costco employees to determine whether they wanted to opt into the collective action.  (Id.)  Following dissemination of the FLSA notice, slightly over 1,500 Costco employees submitted forms to opt into the collective action.  (See ECF Nos. 116, 117, 118, 121, 122.)

Discovery has concluded, and this case is now at the second stage of the "similarly situated" analysis.  See Beauperthuy v. 24 Hour Fitness USA, Inc., 772 F. Supp. 2d 1111, 1118 (N.D. Cal. 2011) (citing Reed v. Cnty. of Orange, 266 F.R.D. 446, 449 (C.D. Cal. 2010)).  At this stage, "it is plaintiffs' burden to provide substantial evidence to demonstrate that they are similarly situated."  Reed 266 F.R.D. at 449.  In deciding whether plaintiffs have met their burden, courts consider: "(1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations."  Beauperthuy, 772 F. Supp. 2d at 1118 (citing Reed, 266

---

[11] Contrary to Costco's position, this Court finds no controlling authority stating that the Rule 23 commonality analysis that the Supreme Court articulated in Dukes must inform a district court's application of the FLSA's "similarly situated" standard.  Indeed, the cases Costco cites for this proposition were each decided before the Supreme Court decided Dukes.  While there may be similarities between Rule 23's commonality standard and the FLSA's "similarly situated" standard, the standards are separate and distinct.  See, e.g., Troy, 276 F.R.D. at 651 ("[C]ourts have made clear that the FLSA's 'similarly situated' requirement is less demanding than the Rule 23 commonality requirement that was at issue in Dukes."); Houston, 591 F. Supp. 2d at 832 (E.D. Va. 2008) ("[C]ourts have observed that the requirements for class certification of a collective action under FLSA are similar, but not identical, to those that pertain to certification of a class under [Rule] 23.").

1  F.R.D. at 449).

2  **B.     Analysis**

3  **1.     Factual & Employment Settings**

4  Costco asserts the opt-in claimants worked different shifts, performed different

5  job duties, worked at different warehouses, and reported to different managers.  Costco

6  thus reiterates that liability would hinge on factors related to when the last customer

7  left each day, when employees clocked out, whether employees were permitted to exit

8  after clocking out, and whether employees were detained for a compensable time.

9  In response, Stiller argues that Costco's companywide, uniformly enforced

10  policy of detaining employees during closing procedures without pay renders

11  immaterial any marginal differences in the opt-in claimants' factual and employment

12  settings.

13  The Court has found that Plaintiffs have offered substantial evidence of a

14  companywide, uniformly enforced policy of detaining employees during closing

15  procedures without pay (i.e., the Alleged Policy).  The Court has also found, however,

16  that the Alleged Policy did not always result in employees being detained without pay.

17  Rather, the Alleged Policy only resulted in some employees being detained without

18  pay. Thus, while examining the existence and effect of the Alleged Policy may provide

19  answers to questions that are central to this case (e.g., whether the Alleged Policy

20  resulted in Costco's control over employees and whether Costco knew the Alleged

21  Policy caused employees to be detained without pay), the Court agrees with Costco that

22  differences in the way managers implemented the Alleged Policy require individualized

23  inquiries to establish liability.  The Court finds these differences weigh against a

24  finding that the opt-in claimants are "similarly situated."

25  **2.     Individualized Defenses**

26  Costco contends that each of its defenses—that any unpaid detention time was

27  de minimis, that the statute of limitations has run as to some instances of unpaid

28  detention time, and the possible lack of credibility of each opt-in plaintiff—requires

1    individualized determinations.

2          Stiller argues in response that Costco's defenses are susceptible to common

3    proof under the Mt. Clemens model of representative proof.

4          The Court has already determined that the Mt. Clemens model may only be used

5    to calculate damages.  (See n.14, above.)  And, under the FLSA, the de-minimis rule

6    is a defense to liability.  See Lindlow v. United States, 738 F.2d 1057, 1061-62 (9th

7    Cir. 1984) ("As a general rule, employees cannot recover for otherwise compensable

8    time if it is de minimis.").  Still, where employees report a common experience—such

9    as donning/doffing without pay—the issue of whether the time employees spent

10   engaged in that experience was de-minimis may by determined by common proof.  See

11   Reed, 266 F.R.D. at 464 (finding de-minimis defense in donning/doffing case subject

12   to common proof); Wren v. RGIS Inventory Specialists, 256 F.R.D. 180, 213 (N.D.

13   Cal. 2009) (same).   In contrast, operation of the Alleged Policy in this case only

14   sometimes resulted in employees being detained during closing procedures without

15   pay. Thus, whether the opt-in claimants performed uncompensated work as a result of

16   the Alleged Policy depends on several individualized facts, including whether any

17   uncompensated work was de minimis.  In the same vein, the Court finds Costco should

18   have the opportunity to determine whether individual opt-in claimants are being

19   truthful about experiencing unpaid detention time as a result of the Alleged Policy.

20         Conversely, the Court finds Costco's statute-of-limitations defense may be

21   determined on a collective basis.  The statute of limitations for an FLSA claim is

22   extended from two to three years where the FLSA violation was willful. 29 U.S.C. §

23   255(a).  Because Plaintiffs have offered substantial evidence that the Alleged Policy

24   existed and sometimes resulted in unpaid detention time, the Court finds the issue of

25   whether Costco willfully implemented the Alleged Policy, knowing it resulted in

26   unpaid detention time, may be resolved on a collective basis.

27                    **3.     Fairness & Procedural Considerations**

28         Costco argues a collective trial would be unfair because only individualized

34

proof can establish liability and common proof of damages is entirely absent. Costco asserts that relying on experts to establish liability and damages would result in a "trial by formula" that would strip Costco of its right to mount individualized defenses. Costco claims that, even if one could find representative proof, Costco would still be unable to put on a defense through representative proof because each claim of unpaid waiting time would require individualized scrutiny.

In response, Stiller argues that fairness and procedural considerations favor continued certification because determining whether Costco's policies violate wage and hour laws will lower the burden on individual claimants, whose recovery would be relatively low compared to the cost of individual litigation. Stiller also argues that separate trials would be the worst possible outcome in terms of judicial efficiency.

While continued FLSA certification would conserve judicial resources and significantly lower the burden on individual opt-in claimants, the Court cannot escape the fact that Plaintiffs have failed to offer a viable method of establishing liability on a classwide basis. See Disc. § I(B)(2)(ii), above (finding individualized inquiries predominate over common questions under the more exacting Rule 23(b)(3)). The Court thus finds that procedural concerns weigh against continued certification.

Having considered the foregoing factors, the Court finds they weigh in favor of concluding that Stiller and each of the opt-in claimants are not "similarly situated." The Court will therefore decertify the FLSA Class.

## CONCLUSION & ORDER

Based on the foregoing, **IT IS HEREBY ORDERED** that Costco's Motion to Decertify, (ECF No. 146), is **GRANTED**. Both the California Class and the FLSA Class are hereby **DECERTIFIED**.

DATED: April 15, 2014

HON. GONZALO P. CURIEL
United States District Judge